# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA,**

v.

Criminal No.   16-222

**HABYS OMAR MERAN**
**JUAN WILQUIN HERNANDEZ-BOURDIER,**

Defendants.

## MEMORANDUM OPINION

CONTI, Chief District Judge.

Pending before the court are motions to suppress evidence and statements (ECF Nos. 66 and 69) filed by defendants Habys Omar Meran ("Meran") and Juan Wilquin Hernandez-Bourdier ("Hernandez") (collectively, "defendants") in the above-captioned case. On October 11, 2016, a federal grand jury in the Western District of Pennsylvania returned a two-count indictment charging defendants with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. § 846 and possession with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i). (ECF No. 1.) On March 29 and 31, 2017, Meran and Hernandez each filed a motion to suppress evidence and statements (ECF Nos. 66 and 69.) The court held a hearing on defendants' motions on June 8, 2017. The official transcript has been filed of record. (ECF No. 86.)

During the hearing, the court heard testimony from Pennsylvania State Police ("PSP") Corporal Reed Grenci ("Corporal Grenci") and PSP Trooper Robert Warman ("Trooper Warman"). In addition, the government submitted six exhibits which were admitted into evidence: (1) CD recording from Corporal Grenci's Mobile Video Recorder ("MVR") (Ex. 1);

1

(2) CD recording from Trooper Warman's MVR (Ex. 2); (3) transcript of the recording from Corporal Grenci's MVR (Ex. 3); (4) transcript of the recording from Trooper Warman's MVR (Ex. 4); (5) transcript of Spanish translation of conversation between Meran and Hernandez while seated in Trooper Warman's patrol vehicle (Ex. 5); and (6) CD of video showing the Troopers opening the trap on the van (Ex. 6). (ECF No. 86 at 27-29, 206-208.)

The parties filed proposed findings of fact and conclusions of law on the grounds raised in the motions to suppress: (1) the legality of the traffic stop, including whether it was unlawfully extended; (2) the voluntariness of Meran's consent to search and whether the search exceeded the scope of consent; and (3) alleged violations of the Miranda requirements. Meran and Hernandez respectively filed their proposed findings of fact and conclusions of law on September 19 and 21, 2017. (ECF Nos. 90 and 92.) The government filed its proposed findings of fact and conclusions of law on September 20, 2017. (ECF No. 91). Upon consideration of the parties' submissions and the evidence and testimony presented at the suppression hearing, the court makes the following findings of fact and conclusions of law:

## I. **Findings of Fact**

1. Both Corporal Grenci and Trooper Warman are assigned to the Safe Highways Initiative for Effective Law Enforcement and Detection ("SHIELD") unit in the PSP's Bureau of Drug Law Enforcement. (ECF No. 86 at 31, 167.) Troopers assigned to the SHIELD unit are responsible for full-time criminal highway interdiction, which involves patrolling major highways to intercept individuals involved in any type of criminal activity. (Id. at 33, 34.)

2. Corporal Grenci is a SHIELD supervisor and an instructor in the unit. (Id. at 31, 35.) He has approximately 450 hours of interdiction training, including attending conferences

throughout the United States and networking with other interdiction officers to discuss current tactics used in narcotics smuggling. (Id. at 35-36.) Corporal Grenci has conducted approximately 30 major seizures of contraband. (Id. at 35, 81.)

3.      On January 26, 2016, Corporal Grenci was in an unmarked police vehicle positioned in an emergency crossover on Interstate 80 in Mercer County, Pennsylvania. (Id. at 36, 39.) Corporal Grenci was performing his daily criminal interdiction duties by watching eastbound traffic for traffic violations or certain driving behaviors that drew his attention. (Id. at 36-37.)

4.      Corporal Grenci's patrol vehicle is equipped with a MVR, which is positioned in the middle of the windshield. (Id. at 38-39.) The MVR begins recording when a trooper activates the vehicle's emergency lights. (Id. at 38.) A microphone clipped to Corporal Grenci's uniform records the audio portion of a traffic stop. (Id. at 39.) Trooper Warman confirmed that he has the same equipment. (Id. at 168-69.)

5.      Corporal Grenci explained that the MVR camera accurately records what occurs; however, there are some limitations on what the MVR can capture because of its position in the vehicle, as opposed to what Corporal Grenci can see in real time from his vantage point. (Id. at 132.)

6.      Corporal Grenci acknowledged that the MVR recording of the traffic stop at issue in this case (Ex. 1) is a fair and accurate depiction of what occurred. (ECF No. 86 at 133.)

7.      Corporal Grenci observed a red or maroon Honda Odyssey minivan travel past his position at approximately the speed limit of 65 to 70 miles per hour. (Id. at 40, 45, 130.) Corporal Grenci observed that the driver's side window was tinted along with the other windows in the back, which precluded him from clearly viewing the driver. (Id. at 40, 159.) The

3

recording from Corporal Grenci's MVR confirms that the minivan had dark tinted windows. (Ex. 1 at :01.)

8.      Corporal Grenci noticed the van was registered in Pennsylvania, and, under Pennsylvania law, window tint must allow 70 percent light transmittance. (ECF No. 86 at 41.) Based on his training and experience, Corporal Grenci recognized that the window tint on the van was illegal. (Id.) Accordingly, Corporal Grenci pulled out onto the highway to pursue the van. (Id.)

9.      When Corporal Grenci pulled onto the highway, the van was in the right lane of travel behind a tractor-trailer truck. (Id. at 42.) As Corporal Grenci followed the van, he observed it move to the left lane without signaling. (Id.). The van was approximately 200 to 300 yards in front of Corporal Grenci when it made the unsignaled lane change. (Id. at 132, 154.) The recording from Corporal Grenci's MVR does not show any visible blinking light or signal on the left rear of the van prior to or during its move from the right lane of the highway to the left lane. (Ex. 1 at :20-:30.)

10.     Corporal Grenci observed the van pass two tractor-trailer trucks and saw the van hit the yellow line two or three times. (ECF No. 86 at 42.) After passing the second truck, the van moved back into the right lane; this time signaling before doing do. (Id.)

11.     After observing the window tint and the unsignaled lane change, Corporal Grenci activated the lights on his vehicle, and the van pulled over to the right shoulder of the highway. (Id. at 45.)

12.     Prior to approaching the van, Corporal Grenci checked the license plate, which appeared to be valid and indicated the van was registered in Pennsylvania to Angel Rameu. (Id. at 47, 93.) Corporal Grenci's registration check confirmed that the van was not identified as

4

having been stolen. (Id. at 94.)

13.     Corporal Grenci approached the van on the passenger side, the windows were down, and he saw a male driver and a male front seat passenger inside. (Id. at 47-48.)

14.     Corporal Grenci identified the driver as Habys Meran by his New York driver's license and the passenger as Juan Hernandez-Bourdier by a Dominican Republic identification card. (Id. at 49, 95, 97.)

15.     Corporal Grenci advised Meran that the reasons for the traffic stop were illegal window tint and failing to use a turn signal when making a lane change. (Id. at 49.)

16.     Corporal Grenci asked Meran if the van was his vehicle, and Meran replied that his friend was the owner. (Id. at 95.)

17.     Corporal Grenci noticed that Meran spoke with an accent and observed that his primary language apparently was not English. (Id. at 97, 109.) Corporal Grenci asked Meran whether he speaks English, and Meran replied, "a little." (Ex. 3 at 1.) Corporal Grenci recalled that Meran told him once during their conversation that his English was not very good. (Id. at 4; ECF No. 86 at 109.) Corporal Grenci also ascertained that Hernandez's first language was not English. (ECF No. 86 at 103.)

18.     At this point in the traffic stop, Corporal Grenci was aware of the following: window tint is common on vehicles used to transport contraband; Interstate 80 is a known major drug corridor; the van was registered in Philadelphia, Pennsylvania, to Angel Rameu, not Meran, who possessed a New York driver's license; and Philadelphia and New York are major source and consumption areas for drugs. (Id. at 43, 44, 50, 51.)

19.     While positioned at the passenger side window, Corporal Grenci noticed a single key in the ignition. (Id. at 50.) In Corporal Grenci's experience, a single key may signify that

5

the vehicle is a "third-party vehicle," meaning that the owner is not the same person who is driving it. (Id.) Corporal Grenci explained that third-party vehicles are commonly used by smugglers, so that the individuals who are in the vehicle can claim they have no knowledge of its contents. (Id. at 51.)

20.    Corporal Grenci observed an energy drink, which was significant to him because smugglers attempt to travel a long distance as quickly as possible. (Id. at 53-54.) At some point, he noticed air fresheners in the van, which he explained are often used to mask the odor of narcotics. (Id. at 53, 119.) Corporal Grenci also knew that during the previous year, two other SHIELD members conducted stops on Honda Odyssey vans that contained a trap in the rear bumper area. (Id. at 46, 118.)

21.    Corporal Grenci conceded that many of the above-referenced items are innocent standing alone, but he noted they collectively represent significant indicators of criminal activity based on his experience in highway interdiction. (Id. at 53.)

22.    After making the foregoing observations, Corporal Grenci gave a thumbs up signal to the MVR to indicate that he "knew [he] had something at that point." (Id. at 55.)

23.    Corporal Grenci asked Meran to exit the van so that he could hear him better, but also because he wanted to investigate further. (Id. at 106.) Meran complied with Corporal Grenci's request. (Id. at 55.)

24.    Corporal Grenci asked Meran whether he had any weapons, and Meran replied that he did not. (Id. at 56.) Meran agreed to Corporal Grenci's request to pat him down and no weapons or drugs were found on him. (Id. at 56, 106.)

25.    Corporal Grenci asked Meran who owned the van, and Meran responded that it belonged to a friend named "Angel," who lives in Philadelphia, but he did not know Angel's last

6

name. (Id. at 57-58, 98, 112, 115). Meran told Corporal Grenci that he borrowed the van in Philadelphia the prior day. (Ex. 3 at 3-4.) Corporal Grenci thought it was unusual that Meran was using a borrowed van so far away from home without knowing the owner's last name. (ECF No. 86 at 58.)

26. Corporal Grenci asked Meran who the passenger was and he said his wife's uncle. (Id. at 58.) When Corporal Grenci asked for the passenger's name, Meran initially hesitated and then provided only the name "Wilquin." (Id. at 58-59, 112.)

27. Corporal Grenci asked Meran about his travels, and Meran was unable to explain where he was coming from, but said he was going back to New Jersey. (Id. at 59; Ex. 3 at 5.) Overall, Corporal Grenci believed Meran was stalling and found his answers to be evasive, but conceded that Meran's hesitation partly could be attributed to his difficulty speaking English. (ECF No. 86 at 60, 110.)

28. While Meran stood near the passenger side window of the patrol vehicle, Corporal Grenci checked Meran's driver's license. (Id. at 60-61.) Meran explained that even though he had a New York driver's license, he had been living in Jersey City, New Jersey, for a number of years. (Id. at 61.) Corporal Grenci determined that Meran's license was valid and that he had one theft-related offense. (Id.)

29. Pursuant to Corporal Grenci's request for back-up assistance, Trooper Warman arrived at the scene, and Corporal Grenci asked him to verify the identification information for Hernandez. (Id. at 63, 167, 168.)

30. Trooper Warman approached the passenger side of the van and attempted to obtain Hernandez's identifying information, but was unsuccessful because Hernandez had a hard time understanding Trooper Warman. (Id. at 169, 198, 200.)

31. Trooper Warman confirmed that when he arrived, Meran was standing next to Corporal Grenci's front side passenger window and he was not handcuffed. (Id. at 168.)

32. Corporal Grenci next inquired whether Meran had anything illegal in the van such as drugs or guns, and Meran replied, "no, no." (Ex. 1 at 13:32-13:35; Ex. 3 at 5.)

33. After that, Corporal Grenci asked Meran if he could search the van, to which Meran replied, "yeah, yeah, yeah, sure." (ECF No. 86 at 62; Ex. 1 at 13:36-13:37; Ex. 3 at 5.) To be certain, Corporal Grenci asked Meran a second time whether he could conduct a search, and Meran provided the same affirmative response. (ECF No. 86 at 62; Ex. 1 at 13:38-13:40; Ex. 3 at 5.) Corporal Grenci requested consent to search the van 12 minutes after he initiated the traffic stop. (ECF No. 86 at 162.)

34. Corporal Grenci was convinced that Meran understood his questions and gave his voluntary consent to search the van. (Id. at 62-63, 122.) Overall, Trooper Grenci felt certain that Meran understood him because he immediately answered questions such as whether he had weapons and whether he agreed to be patted down. (Id. at 162.)

35. Corporal Grenci did not advise Meran that he could refuse giving permission to search the van. (Id. at 120.)

36. Corporal Grenci did not provide Meran with a consent to search form in English or Spanish, even though he had both forms in his vehicle. (Id. at 121-22.)

37. When Corporal Grenci advised that he was going to search the van, Trooper Warman asked Hernandez to exit and then patted him down. (Id. at 64, 169.) Trooper Warman did not find any drugs, weapons or contraband. (Id. at 169.)

38. During the search of the vehicle, Meran and Hernandez were not restrained and stood next to each other off the highway 10-15 yards in front of the van. (Id. at 64, 65, 169.)

8

39.     Corporal Grenci first opened the driver's door to locate the button to release the rear hatch. (Id. at 65.) He then went to the back of the van, looked underneath the bumper area of the vehicle and saw a square box that was painted black with a little rust on it where the bumper should be located. (Id. at 66, 67, 170.) Based on his training and experience, Corporal Grenci knew that the box was an aftermarket compartment, which is used to hide criminal contraband. (Id. at 67.)

40.     To confirm the box was a trap, Corporal Grenci peeled back the plastic piece that sits on top of the bumper, through which he could see a metal box. (Id. at 67-68.) Corporal Grenci believed the trap was the same as the traps that his fellow troopers had found on other Honda Odyssey minivans. (Id. at 68.)

41.     Corporal Grenci explained that it can be very difficult to open traps because they usually are wired and require a special sequence of events to unlock them. (Id. at 69.) Therefore, he decided to have the van towed to the barracks so that he could determine how to open the trap. (Id.)

42.     When Corporal Grenci discovered the trap, he decided to detain Meran and Hernandez. (Id. at 69, 125.) Corporal Grenci advised them that they were not under arrest, but they were being detained until the troopers could determine how to open the trap and see if anything was inside. (Id. at 75.) Meran and Hernandez were handcuffed and placed in Trooper Warman's patrol vehicle to be transported to the PSP barracks at Mercer. (Id. at 70, 125, 170, 175-76.)

43.     After Meran was handcuffed but before he was placed in Trooper Warman's vehicle, Trooper Warman told Meran that he was not free to go. (Id. at 176; Ex. 4 at 3.) Trooper Warman then recited the Miranda warnings to Meran in English. (ECF No. 86 at 178; Ex. 2 at

9

10:50-11:12; Ex. 4 at 3.) As shown on the recording of the traffic stop, this occurred on the side of the highway as traffic passed by, which created a significant amount of background noise. (Ex. 2 at 10:50.) Trooper Warman recited the Miranda warnings very quickly, listing them one after the other without pausing at any point to confirm or verify that Meran understood his Miranda rights or agreed to waive them. (Id. at 10:50-11:12; Ex. 4 at 3.)

44. Although a Miranda rights form is available in Spanish, Trooper Warman did not have one with him. (ECF No. 86 at 123-24, 178.)

45. Trooper Warman did not read or recite Hernandez his Miranda rights at any time. (Id. at 202, 203.)

46. After reciting the Miranda warnings to Meran, Trooper Warman immediately began asking Meran questions. (Id. at 181; Ex. 2 at 11:14; Ex. 4 at 3). At no time did Meran state that he understood his rights and agreed to waive them.

47. Trooper Warman conceded that he did not know whether Meran understood his rights when he administered the Miranda warnings, but he believed that Meran could understand English as their conversation progressed. (ECF No. 86 at 205.)

48. Trooper Warman agreed that the waiver of Miranda rights is an important fact, but conceded that his report of the incident does not indicate that Meran waived his Miranda rights and agreed to speak with him. (Id. at 185.)

49. Trooper Warman continued to ask Meran questions from the time he was placed in the trooper's vehicle until they arrived at the barracks. (Id. at 186; Ex. 4 at 3-13.) The conversation was recorded on Trooper Warman's MVR. (See generally Ex. 2.)

50. While in Trooper Warman's vehicle, Meran and Hernandez conversed in Spanish, which also was recorded on Trooper Warman's MVR. (ECF No. 86 at 188; Ex. 4 at 7, 8, 9, 13.)

10

51.     The conversation between Meran and Hernandez was translated from Spanish to English and indicates that Meran was able to answer Hernandez's questions concerning what was happening. (See generally, Ex. 5.) For example, Meran explained to Hernandez that the troopers were investigating, they found a trap, one of the troopers asked to check Meran's phone, but he did not want the trooper to look at it, and Meran hoped there was nothing in the van. (Ex. 4 at 7, 13; Ex. 5.)

52.     In response to the tow truck dispatcher's question whether the van had front wheel or rear wheel drive, Corporal Grenci commented that he could not get that information because Meran and Hernandez do not speak English. (ECF No. 86 at 158-59, 163; Ex. 3 at 7.) Corporal Grenci could not recall what his thought was in making that comment. (ECF No. 86 at 163.)

53.     Corporal Grenci remained with the van until the tow truck arrived and then followed it along with Trooper Warman's vehicle back to the PSP Mercer barracks. (Id. at 71.) After arriving at the barracks, Trooper Warman took Meran and Hernandez inside to the control room, where he shackled one ankle of each defendant to a bench and removed their handcuffs. (Id. at 172.)

54.     Corporal Grenci determined how to open the trap and he recovered four kilograms of heroin from it. (Id. at 73-74, 82.)

55.     After the heroin was recovered, Meran and Hernandez were informed that they were under arrest. (Id. at 172-73.)

56.     The remainder of the van was searched and Trooper Warman recovered two backpacks from the passenger compartment. (Id. at 74, 173, 189.) Trooper Warman recalled that phones were recovered. (Id. at 191.)

11

57. Trooper Warman approached Meran and Hernandez with a backpack in each hand. (Id. at 173-74.) Trooper Warman held up one backpack and Meran nodded his head, indicating it belonged to him. (Id. at 174.) Trooper Warman held up the other backpack and Hernandez did the same. (Id.) Trooper Warman acknowledged that he did this because he wanted Meran and Hernandez to tell him who owned the backpacks. (Id. at 174.)

58. Trooper Warman did not administer Miranda warnings to Meran and Hernandez prior to holding up the backpacks to determine who owned them. (Id. at 192.)

## II. Conclusions of Law

### A. Standing to Challenge Traffic Stop

1. The Fourth Amendment right to be free from unreasonable searches and seizures is a personal right and a defendant must establish standing in order to assert that right.[1] See United States v. Padilla, 508 U.S. 77, 81-82 (1993). A defendant bears the burden to establish standing to raise a Fourth Amendment challenge. See Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978). In order to establish standing, an individual claiming Fourth Amendment protection must "demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998).

2. "A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver . . . ." Brendlin v. California, 551 U.S. 249, 257 (2007). Thus, a traffic stop is a seizure of everyone in the stopped vehicle. See Delaware v. Prouse, 440 U.S. 648, 653 (1979). For this reason, both a driver and a passenger have standing to challenge the stop of a

---

[1] "The 'standing' inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." United States v. Mosley, 454 F.3d 249, 253 n.5 (3d Cir. 2006) (citations omitted).

vehicle. See Brendlin, 551 U.S. at 258-59 (holding that a passenger of an automobile that was pulled over by the police for a traffic stop was entitled to challenge constitutionality of that stop); Mosley, 454 F.3d at 253 (holding that passengers have standing to object to a vehicle stop). Accordingly, the court finds that both Meran and Hernandez have standing to challenge the traffic stop at issue in this case.[2]

## B. Legality of Traffic Stop

3. "The Fourth Amendment permits a traffic stop based on reasonable suspicion that a traffic violation has occurred regardless of the officer's subjective motivations for making the stop." United States v. Byrd, 679 F. App'x 146, 149 (3d Cir. 2017), cert. granted, 2017 WL 2119343 (Sept. 28, 2017) (No. 16-1371) (citing United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006) ("[T]he . . . reasonable suspicion standard applies to routine traffic stops."); Mosley, 454 F.3d at 252 ("[T]he Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime.").

4. "[A] traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." Delfin-Colina, 464 F.3d at 398. Consequently, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place." Id.

5. The police have reasonable suspicion justifying a traffic stop when a vehicle has dark tinted windows in violation of Pennsylvania law. See United States v. Johnson, 452 F.

---

[2]     The government agrees that both defendants have standing to challenge the traffic stop. (ECF No. 75 at 2; ECF No. 91, ¶ 1.)

13

App'x 219, 225 (3d Cir. 2011); United States v. Gooch, 915 F. Supp. 2d 690, 704 (W.D. Pa. 2012) (finding vehicle stop was based on reasonable suspicion where trooper who was experienced in highway interdiction credibly testified that he observed heavy tint on driver's side windows as the vehicle passed him going the speed limit even though he was in a minimally lit area at night time). The failure to use a turn signal in violation of Pennsylvania law also provides a lawful basis to make a traffic stop. See Carr v. City of Erie, 110 F. App'x 236, 237 (3d Cir. 2004).

6.    Corporal Grenci's testimony establishes that he reasonably believed the window tint on the Honda Odyssey minivan driven by Meran violated Pennsylvania law. When the van travelled past Corporal Grenci's position, he saw dark window tint on the driver's side window (along with the other windows in the back), which precluded him from clearly viewing the driver. (ECF No. 86 at 40, 159.)

7.    Defendants argue that the recording from Corporal Grenci's MVR contradicts his testimony because the van's speed would have made it difficult for Corporal Grenci to see the window tint. (ECF No. 90, ¶ 140; ECF No. 92 at 21-22.) The court disagrees and finds that the recording shows that the vehicle had dark tinted windows. (Ex. 1 at :01.) In the court's view, the dark window tint likely was more readily apparent to Corporal Grenci, who viewed the event in real time and is experienced in spotting vehicle code violations.

8.    The recording corroborates Corporal Grenci's credible testimony that the van had dark window tint, which was in violation of Pennsylvania law. On that basis alone, Corporal Grenci had reasonable suspicion to conduct a traffic stop of the van.

9.    Corporal Grenci also testified that he observed the van move from the right lane

14

of the highway to the left lane without signaling, in violation of Pennsylvania law. (ECF No. 86 at 42.)

10. Defendants assert that Corporal Grenci's testimony is contradicted by the recording from his MVR, which they contend show it is impossible to see that the van changed lanes without signaling. (ECF No. 90, ¶ 144; ECF No. 92 at 22-23.) The court disagrees. The recording shows that there was no visible blinking light or signal on the left rear of the van prior to or during its move from the right lane of the highway to the left lane. (Ex. 1 at :20-:30.) Even assuming for the sake of argument that the absence of blinking lights was not apparent on the recording, the court accepts Corporal Grenci's reasonable explanation that there are some limitations what the MVR can capture because of its position in the vehicle, as opposed to what he is able to see in real time from his vantage point. (ECF No. 86 at 132.) At a minimum, the recording from the MVR does not disprove Corporal Grenci's observation that the van made an unsignaled lane change. (Ex. 1 at :20-:30.)

11. The court accepts as credible Corporal Grenci's testimony concerning the dark window tint and the unsignaled lane change and concludes that the traffic stop was lawful because it was based on Corporal Grenci's reasonable suspicion that he observed two traffic violations.

## C. **Duration of Traffic Stop**

12. "[O]fficers conducting a traffic stop must act with reasonable diligence in carrying out permissible tasks related to the purpose for the stop." Byrd, 679 F. App'x at 149 (citing Rodriguez v. United States, 135 S.Ct. 1609, 1614 (2015)). Permissible tasks include inspecting the driver's license, checking the vehicle's registration and proof of insurance and

determining whether there are any outstanding warrants against the driver. Rodriguez, 135 S.Ct. at 1615.

13.     "Once a valid traffic stop is initiated, 'an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.'" United States v. Lewis, 672 F.3d 232, 237 (3d Cir. 2012) (quoting United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003)). To evaluate whether reasonable suspicion exists, "a court must consider the totality of the circumstances, in light of the officer's experience." Givan, 320 F.3d at 458.

14.     The Third Circuit Court of Appeals held that a police officer had reasonable and articulable suspicion that the defendant was engaged in criminal activity, justifying expansion of the scope of his investigation beyond the traffic stop where, *inter alia*, the following factors were present: (1) the prevalence of drug trafficking along the Pennsylvania Turnpike; (2) a strong odor of air fresheners in the vehicle; (3) multiple cell phones in the center console; (3) discrepancies between the state where the defendant's license was issued and the state where the vehicle was registered; (4) the vehicle's third-party ownership; (5) the unusual explanation of the defendant's travel plans; and (6) the defendant's criminal history, as well as his denial of it. See United States v. Robinson, 529 F. App'x 134, 138 (3d Cir. 2013). "Taken together and in light of [the officer's] experience in narcotics interdiction, these circumstances provided [the officer] with a reasonable basis for expanding the scope of the initial traffic stop through additional questioning." Id. at 138-39 (citing Givan, 320 F.3d at 458) (finding that an officer had reasonable suspicion when he observed that an individual was speeding, operating a vehicle that belonged to a third party, travelling a route often used for transporting drugs and had unusual travel plans)).

16

15.     Like the officer in Robinson, Corporal Grenci observed multiple indicators of drug smuggling that, taken together and viewed in light of his criminal highway interdiction experience, provided him with reasonable suspicion to expand the scope of the initial traffic stop. Those factors included the following: (1) the Honda Odyssey minivan had dark window tint, which is common on vehicles used to transport illegal contraband; (2) the van was travelling on Interstate 80, which is a known major drug corridor; (3) two other SHIELD members conducted stops on Honda Odyssey vans that contained a hidden trap in the rear bumper; (4) Meran said the van belonged to his friend Angel, but he did not know Angel's last name; (5) the van was registered in Philadelphia, Pennsylvania, to Angel Rameu, not Meran, who possessed a New York driver's license; (6) Philadelphia and New York are major source and consumption areas for drugs; (7) there was a single key in the ignition, which often signifies a third-party vehicle used by individuals who smuggle contraband; (8) there was an energy drink in the van, which often indicates the occupants are attempting to travel a long distance in a short period of time; and (9) there were air fresheners in the van, which are often used to mask the odor of narcotics. (ECF No. 86 at 43, 44, 46, 50-51, 53-54, 57-58.)

16.     Corporal Grenci conceded, and the court agrees, that any one of the foregoing factors in isolation would not necessarily create reasonable suspicion of criminal activity. (Id. at 53.) Taken together and considered through the lens of Corporal Grenci's experience in highway interdiction, those factors provided him with reasonable suspicion to conclude that defendants were involved in criminal activity, which justified the extension of the traffic stop for further investigation. Therefore, the court finds that the duration of the traffic stop was lawful.

17

## D.  Standing to Challenge Vehicle Search

17.  The government argues that defendants did not present any evidence to establish that they have standing to challenge the search of the van.  (ECF No. 91, ¶ 5.)  According to the government, Hernandez's mere presence as a passenger in the van does not permit him to challenge the search, and Meran failed to present any evidence that he was lawfully provided with the keys to the van or that the owner of the van approved of his possession.  (Id., ¶¶ 6, 7.)

18.  As stated, defendants bear the burden to establish standing to raise a Fourth Amendment challenge.  See Rakas, 439 U.S. at 130 n.1.

19.  The government is correct that Hernandez lacks standing to challenge the search of the van.  It is well settled that "a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car."  United States v. Burnett, 773 F.3d 122, 131 (3d Cir. 2014) (quoting United States v. Baker, 221 F.3d 438, 441–42 (3d Cir. 2000)).  This is because "[p]assengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding."  Mosley, 454 F.3d at 252-53.

20.  Unlike Hernandez, Meran has standing to challenge the search of the van because he borrowed it from a friend and had lawful possession of it.

21.  This court recently explained that standing requires a fact-bound inquiry to assess: (1) the strength of the driver's interest in the car; and (2) the nature of his control over it.  United States v. Jones, Crim. No. 16-27, 2017 WL 1190501, at *3 (W.D. Pa. Mar. 31, 2017) (citing Baker, 22 F.3d at 441)).

22.  In Jones, the defendant had standing to challenge the vehicle search because he was the sole occupant of the car, he obtained possession of the car with his cousin's consent, he exercised exclusive control over it for several hours, and there was no evidence that it was stolen.

Jones, 2017 WL 1190501, at *4. The defendant in Baker likewise had standing to challenge the search of a vehicle that he borrowed from a friend and drove for a number of weeks, even though he was somewhat vague about who owned the car; there, however, was no evidence in the record that the vehicle was stolen. Baker, 221 F.3d at 442-43.

23. Similar to Jones and Baker, Meran told Corporal Grenci that he borrowed the van the prior day from a friend named Angel who lives in Philadelphia, Pennsylvania. (ECF No. 86 at 57-58, 98, 112, 115; Ex. 3 at 3-4.) Corporal Grenci confirmed that the registered owner of the van was an individual named Angel Rameu from Philadelphia, Pennsylvania. (ECF No. 86 at 47, 93.) Corporal Grenci verified that the van was not stolen. (Id. at 94.)

24. The government argues that Meran did not call witnesses or present evidence at the suppression hearing and consequently failed to meet his burden to establish standing to challenge the vehicle search. (ECF No. 91, ¶¶ 5, 7.) The government cited United States v. Stearn, 597 F.3d 540, 551 (3d Cir. 2010), for the proposition that "a defendant must demonstrate that his own Fourth Amendment rights were violated by the challenged search or seizure." In Stearn, however, the court of appeals did not specify how that showing must be made, i.e., there was no holding that the defendant *only* may rely on his own evidence to establish standing. The government otherwise cited no authority for the proposition that evidence used to establish a defendant's standing must be affirmatively presented by the defendant. Contrary to the government's position, "the defendant need not affirmatively present evidence of his legitimate expectation of privacy; rather, he may simply 'point to specific evidence in the record which the government [has] presented and which establishe[s] his standing.'" United States v. Castellanos, 716 F.3d 828, 846 (4th Cir. 2013) (quoting United States v. Zermeno, 66 F.3d 1058, 1062 (9th Cir. 1995)); see United States v. Doe, 801 F. Supp. 1562, 1573 (E.D. Tex. 1992) (finding that the

19

defendant established a legitimate expectation of privacy in a car through "testimony by a government witness from which it [wa]s reasonable to infer that [the] defendant's possession of the vehicle was lawful and with permission"); 6 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 11.2(b) (5th ed. 2012) ("[I]t may happen that the burden is actually met ... by evidence given by the [government].").

25.     The evidence of record establishes that Meran possessed the van with the consent of his friend who owned it,[3] he had control over it for approximately a day and there was no evidence that it was stolen.    In view of these facts, the court finds that Meran has standing to challenge the search of the van.

26.     The government next argues that even if Meran has standing to challenge the search of the van, he must prove that he also has standing to challenge the search of the trap where the heroin was located.  (ECF No. 91, ¶ 8.)  The government cited no authority to support its position.

27.     In United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993), the Tenth Circuit Court of Appeals held that a defendant who was driving a car loaned to him by his uncle had standing to challenge the search of a secret compartment beneath the car in which cocaine was found.

28.     Like Meran, the defendant in Soto did not testify at the suppression hearing,[4] but the record indicated that he told the police officer that his uncle owned the car and loaned it to him. Id. at 1553. The defendant produced a registration with his uncle's name and a computer

---

[3]        Meran's standing to challenge the search of the van is not undercut by the fact that he did not know Angel's last name.  See Baker, 221 F.3d at 442-43 (finding the defendant had standing even though he was somewhat vague about who owned the car); United States v. Garcia, 897 F.2d 1413, 1418 (7th Cir. 1990) (holding that a driver who borrowed a car, but was unable to provide the owner's last name, had standing to object to the search).

[4]        The fact that the defendant in Soto did not testify at the suppression hearing also supports the proposition that a defendant may rely on all the record evidence, including evidence submitted by the government, to establish his standing.  See supra at 19-20, ¶ 24.

check on the vehicle revealed that it was not stolen. Id. The court in Soto found that "[a]lthough this evidence is not determinative of defendant's right to possess the vehicle, absent evidence that defendant wrongfully possessed the vehicle it is sufficient to confer standing on him to challenge the subsequent search of the car." Id.

29. More specifically, in finding that the defendant had standing to challenge the search of the entire car, including the secret compartment, the court in Soto reasoned as follows:

> [I]f society is willing to recognize as reasonable an expectation of privacy in an automobile in general, it cannot deny such recognition to particular compartments within that vehicle. The fact that secret compartments are most often used to conceal narcotics, weapons, or large amounts of cash does not alter the analysis; such *post hoc* rationalization subverts the purpose of the Fourth Amendment protection against unreasonable searches. Although an automobile is not accorded the same level of privacy protection as a permanent dwelling, if it is to be protected at all, there appears no reason to treat searches of secret compartments within the vehicle on any different basis than searches of the glove compartment or trunk.

Id. at 1553-54.

30. The facts in Soto are strikingly similar to the instant case. Corporal Grenci testified that Meran told him the van belonged to a friend named "Angel," and Corporal Grenci verified that the van was registered to Angel Rameu and that it was not stolen. (ECF No. 86 at 57, 93, 94, 98.)

31. Based on these facts, the court concludes that Meran's standing extends to the entire van, including the hidden trap contained in the rear bumper area. The court agrees with Soto that "there appears no reason to treat searches of secret compartments within the vehicle on any different basis than searches of the glove compartment or trunk." Soto, 988 F.2d at 1554.

21

### E. **Voluntariness of Consent to Search**

32.     Meran concedes he verbally agreed to a search of the van, but he contends that his purported consent to search was not voluntary. (ECF No. 66, ¶ 18.)

33.     "A voluntarily given consent is an exception to the search warrant requirement and is therefore constitutionally permissible." United States v. Velasquez, 885 F.2d 1076, 1081 (3d Cir. 1989) (citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973)). The government bears the burden to prove by a preponderance of the evidence that a search was made pursuant to voluntary consent. Velasquez, 885 F.2d at 1081 (citing United States v. Matlock, 415 U.S. 164, 177 (1974)); see also United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009) ("To justify a search based on consent, the Government 'has the burden of proving that the consent was, in fact, freely and voluntarily given.'" (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).

34.     A determination of whether consent was voluntary is based on the totality of the circumstances. See Schneckloth, 412 U.S. at 227. The analysis involves consideration of "the characteristics of the accused and the details of the interrogation;" however, a case should not "turn[] on the presence or absence of a single controlling criterion." Id. at 226; see also United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994) ("[W]hether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single criterion.").

35.     Factors to consider include: the age, education and intelligence of the defendant; whether he was advised about his constitutional rights; the length of the detention; the repetition or duration of the questioning; and the use of physical punishment. Schneckloth, 412 U.S. at 226; Price, 558 F.3d at 278. The Court of Appeals for the Third Circuit also identified as relevant "the setting in which the consent was obtained [and] the parties' verbal and non-verbal

22

actions." Price, 558 F.3d at 278 (quoting Givan, 320 F.2d at 459)). Finally, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." Schneckloth, 412 U.S. at 227.

36. In view of the totality of the circumstances in this case, the court concludes that Meran's consent to search the van was freely and voluntarily given.

37. First, although Meran demonstrated some difficulty communicating in English, that fact alone does not preclude a finding that his consent was voluntary.

38. Numerous courts have found that a defendant's consent to search was voluntary despite the existence of a language limitation. See United States v. Valdez, 147 F. App'x 591, 596 (6th Cir. 2005) (the defendant's command of English, though tenuous, was sufficient to permit him to give voluntary consent to search vehicle where he readily complied with officer's request to produce driver's license and he appropriately responded to questions about his destination and relationship with the passenger); United States v. Cedano-Medina, 366 F.3d 682, 686-87 (8th Cir. 2004) (finding consent to search voluntary, despite language barrier between the defendant and police officer and apparent lapses that occurred during their conversation, where the defendant provided license and registration upon request, answered questions about his trip and displayed nonchalant attitude during search); United States v. Zubia-Melendez, 263 F.3d 1155, 1163 (10th Cir. 2001) (affirming district court's finding that the defendant and police officer "could converse sufficiently to understand one another" despite "acknowledge[ing] that [the defendant] has trouble speaking and understanding English" and that "the videotape of the traffic stop demonstrates his confusion at several points during the encounter"); United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (finding that the defendant's purported limitation

23

understanding English did not preclude him from providing voluntary consent to search minivan where he was able to answer questions regarding travel plans and twice gave consent to search); United States v. Sanchez-Valderuten, 11 F.3d 985, 990-91 (10th Cir. 1993) (affirming district court's finding that the defendant voluntarily consented to vehicle search, despite difficulty speaking English, his short or single word responses and failure to respond to some questions; the defendant immediately produced license and registration upon request and responded to questions concerning his travel plans and where he was raised); United States v. Massac, 867 F.2d 174, 177 (3d Cir. 1989) (finding consent to search suitcase was voluntary where the defendant, who was a native of Haiti and had limited familiarity with English, had spent several years living in Delaware, possessed a Delaware driver's license and had an evolving ability to understand English).

39.     Similar to those cases, it is undisputed that Meran had some difficulty with English. Corporal Grenci noticed that Meran spoke with an accent and observed that his primary language apparently was not English.[5] (ECF No. 86 at 97, 109). Meran indicated that he speaks "a little" English and told Corporal Grenci once during their conversation that his English was not very good. (Id. at 109; Ex. 3 at 1, 4.) Nevertheless, Meran's difficulty with English did not preclude him from understanding Corporal Grenci's inquiries during their exchange.

40.     Meran produced his driver's license upon Corporal Grenci's request and he complied with Corporal Grenci's request to exit the van. (ECF No. 86 at 49, 55.) When Corporal Grenci asked whether he had weapons, Meran responded that he did not, and agreed to

---

[5]     Corporal Grenci credibly testified that he was convinced Meran understood his questions and gave voluntary consent to search the van. (ECF No. 86 at 62-63, 122.) Nonetheless, Corporal Grenci candidly admitted he commented to the tow truck dispatcher that he could not ask defendants if the van had front wheel or rear wheel drive because they do not speak English. (Id. at 158-59; Ex. 3 at 7.) Corporal Grenci did not recall what his thought was in making that comment. (ECF No. 86 at 163.) Although Corporal Grenci's comment to the tow truck driver was contrary to his credible testimony concerning Meran's ability to understand English, the court concludes that Corporal Grenci's comment does not undermine the finding that Meran could sufficiently understand English to provide voluntary consent in view of the totality of the circumstances discussed herein.

24

a pat down. (Id. at 56; Ex. 3 at 1.)

41.    When Corporal Grenci asked who owned the van, Meran responded that it belonged to a friend named "Angel," who lives in Philadelphia, but he did not know Angel's last name. (ECF No. 86 at 57-58, 98, 112, 115.) Meran responded to Corporal Grenci's question concerning the passenger, identifying him as his wife's uncle, Wilquin, who lives in Manhattan, New York. (Id. at 58-59; Ex. 3 at 4.) Although Meran could not explain where he travelled, he stated he was returning to New Jersey, which is where he lives. (ECF No. 86 at 59, 61; Ex. 3 at 4-5.)

42.    In response to Corporal Grenci's question whether he had anything illegal in the van such as drugs or guns, Meran replied, "no, no." (Ex. 1 at 13:32-13:35; Ex. 3 at 5.) When Corporal Grenci asked Meran if he could search the van, Meran replied without hesitation, "yeah, yeah, yeah, sure." (ECF No. 86 at 62; Ex. 1 at 13:36-13:37; Ex. 3 at 5.) When Corporal Grenci asked again to be sure, Meran immediately provided the same affirmative response. (ECF No. 86 at 62; Ex. 1 at 13:38-13:40; Ex. 3 at 5.)

43.    Although there were lapses in the conversation between Corporal Grenci and Meran, the foregoing summary of their interaction demonstrates that Meran understood and readily responded to Corporal Grenci's requests and inquiries. Though Meran's interaction with Corporal Grenci shows that Meran had a language limitation, the court finds that Meran could sufficiently understand English based on his ability to answer the questions posed to him.

44.    Meran's understanding of his interaction with Corporal Grenci is further evidenced by his ability to answer Hernandez's questions concerning what was happening. (See generally Ex. 5.) Meran explained to Hernandez that the troopers were investigating, they found a trap, one of the troopers asked to check Meran's phone, but he did not want the trooper to look

25

at it, and Meran hoped there was nothing in the van. (Ex. 4 at 7, 13; Ex. 5.)

45.     Meran explained this information to Hernandez in Spanish while they were in Trooper Warman's vehicle during transport to the PSP Mercer barracks. (ECF No. 86 at 188; Ex. 4 at 7, 8, 9, 13.) The conversation was recorded on Trooper Warman's MVR and subsequently translated into English. (ECF No. 86 at 188; see generally Ex. 5.) Meran and Hernandez have no reasonable expectation of privacy in that conversation.

46.     Federal appellate courts consistently have held that "there is no objectively reasonable expectation of privacy in a conversation that occurs in a squad car." United States v. Webster, 775 F.3d 897, 903 (7th Cir. 2015) (collecting decisions); see United States v. Paxton, 848 F.3d 803, 808 (7th Cir. 2017) (collecting federal and state court decisions which have "concluded with apparent unanimity that a person has no objectively reasonable expectation of privacy while seated in a marked patrol car" and noting that those decisions "have deemed it immaterial whether the individual has been arrested, temporarily detained, or simply invited to sit in the car"). "Given the nature of the vehicle and the visible presence of electronics capable of transmitting any internal conversations, the expectation that a conversation within the vehicle is private is not an expectation that society would recognize to be reasonable." Webster, 775 F.3d at 904. Therefore, the recording of a conversation between two suspects in a squad car does not violate the Fourth Amendment. Id.

47.     The secret recording of suspects in a police vehicle does not violate the Fifth Amendment; thus, Miranda does not apply to the conversation in Spanish between Meran and Hernandez.[6] See United States v. Hernandez–Mendoza, 600 F.3d 971, 977 (8th Cir. 2010) (no Miranda violation when officer left the defendants alone in police vehicle with a recording

---

[6]     Although Miranda does not apply to the recorded conversation in Spanish between Meran and Hernandez, Trooper Warman's questioning of Meran which took place in his patrol vehicle on the way to the PSP Mercer barracks implicates Miranda for the reasons explained in Part II.H., infra.

device activated; police "may have expected that the two men would talk to each other if left alone, but an expectation of voluntary statements does not amount to deliberate elicitation of an incriminating response"), amended on denial of reh'g, 611 F.3d 418 (8th Cir. 2010); Stanley v. Wainwright, 604 F.2d 379, 382 (5th Cir. 1979) (no Miranda violation when police secretly recorded suspects while seated in police car because Miranda "does not protect spontaneous utterances made by detainees mistakenly believing that they will not be overheard nor forbid police, under fifth amendment sanction, from setting snares").

48.     In Hernandez-Mendoza and Stanley, the police officers were not present in the patrol vehicle when the defendants made the statements that were recorded. Here, Trooper Warman was present in the patrol vehicle during the recorded conversation in Spanish between Meran and Hernandez. Nevertheless, there is no Miranda violation concerning their conversation because their statements were made to each other, not in response to interrogation by Trooper Warman. At one point, Trooper Warman asked Meran if he could explain to Hernandez that everything was alright because Trooper Warman was unable to do so, and Meran replied, "yea." (Ex. 2 at 18:47-19:07; Ex. 4 at 6.) Meran did not immediately explain anything to Hernandez; rather, Trooper Warman and Meran continued their conversation. (Ex. 2 at 19:08; Ex. 4 at 6.) Hernandez later asked Meran what was going on and Meran explained that the troopers were investigating because there was a trap in the van. (Ex. 2 at 21:43; Ex. 4 at 7; see generally Ex. 5.) There were additional comments and conversation in Spanish between Meran and Hernandez, but the record makes clear that none of it was in response to interrogation by Trooper Warman. (Ex. 4 at 8, 9, 13; see generally Ex. 5.) For example, Hernandez asked Meran what Trooper Warman was saying and Meran explained that Trooper Warman wanted to check his phone, but Meran did not want him to look at it. (Ex. 4 at 13.)

49.     Trooper Warman's presence during the recorded conversation between Meran and Hernandez is analogous to the situation that occurred in Arizona v. Mauro, 481 U.S. 520 (1987). After the defendant was given a Miranda warning, he stated that he did not wish to be questioned without a lawyer present. Id. at 522. The defendant's wife insisted on speaking with him, and a detective permitted her to do so while the detective was present and openly recording their conversation. Id. The tape was later used at trial and the defendant was convicted. Id. at 523-24. The Supreme Court upheld the defendant's conviction, finding that what the detective had done was not the functional equivalent of interrogation. Id. at 527. The detective's presence was not improper because of legitimate safety concerns, the detective had not asked the defendant any questions, and the police had not sent the defendant's wife to speak with him for the purpose of eliciting a confession. Id. at 528. Although the officers were aware of the possibility that the defendant would make an incriminating statement, "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." Id. at 529.

50.     Mauro makes clear that the source of interrogation must be the police or government agents. Meran and Hernandez conversed in Spanish between themselves, not in response to any questioning by Trooper Warman. It is clear that Miranda is not implicated.

51.     Because there are no Fourth or Fifth Amendment concerns, it is appropriate for the court to take into account Meran's ability to explain the situation to Hernandez as evidence of his ability to understand English and provide voluntary consent to search.

52.     Meran's ability to comply with Corporal Grenci's requests and respond to his questions, as well as his ability to explain the situation to Hernandez, are strong indicators that he sufficiently understands English to have given voluntary consent to search.

53.     The record otherwise reveals nothing about Meran's age, education or intelligence

that adversely affected his ability to provide voluntary consent, and the other salient factors which will be addressed next show that Meran's consent was voluntary.

54.    Corporal Grenci sought Meran's consent to search 12 minutes after he initiated the traffic stop; thus, Meran was not detained for a long period of time prior to giving his consent. (ECF No. 86 at 162.)

55.    Corporal Grenci's request to search the van was clear and direct, and Meran did not hesitate to respond or appear reluctant to grant his consent. Corporal Grenci asked Meran if he could perform a search, and Meran immediately replied, "yeah, yeah, yeah, sure." (Id. at 62; Ex. 1 at 13:36-13:37; Ex. 3 at 5.) To be certain that Meran consented to the search, Corporal Grenci asked him a second time, and Meran again responded affirmatively without hesitation. (ECF No. 86 at 62; Ex. 1 at 13:38-13:40; Ex. 3 at 5.) Nothing from the exchange indicates that Corporal Grenci pressured Meran into consenting to the search.

56.    There is no evidence that Corporal Grenci utilized any physical force, drew his weapon or threatened or coerced Meran in any way to get him to consent to the search. Meran was not restrained prior to giving consent to search, and he was permitted to stand next to Hernandez, without handcuffs, during the search. (ECF No. 86 at 64, 65, 169.)

57.    Although Corporal Grenci obtained Meran's consent at the scene of a traffic stop, which can be a stressful situation for any motorist, the recording from Corporal Grenci's MVR confirms that the interaction between Meran and him was cordial and Meran was cooperative. (Ex. 1 at 13:36-13:40.) The recording verifies that Meran did not sound hesitant or flustered when Corporal Grenci asked for consent to search, and he twice immediately responded that Corporal Grenci could search the van. (ECF No. 86 at 62; Ex. 1 at 13:36-13:40; Ex. 3 at 5.) All told, both parties' actions during the exchange indicate Meran's consent was voluntary. See

Price, 558 F.3d at 278 (recognizing that a relevant factor is "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions").

58.     Corporal Grenci did not advise Meran that he could refuse giving him permission to search the van, (ECF No. 86 at 120), but that factor alone is not dispositive. See Schneckloth, 412 U.S. at 227 (knowledge of the right to refuse consent is not the *sine qua non* of an effective consent).

59.     The totality of the circumstances favors a finding that Meran voluntarily consented to the search of the van. Therefore, the court finds that Meran's consent was voluntary, even though he was not advised of his right to refuse consent.

60.     Defendants criticized Corporal Grenci's failure to use a Spanish written consent form or to seek the assistance of another trooper who could speak to Meran in Spanish. (See ECF No. 90, ¶ 171; ECF No. 92 at 32.) While perhaps Corporal Grenci could have been more careful to employ such tactics, given the totality of the circumstances, Corporal Grenci's failure to do so does not undermine the finding that Meran's consent was the product of a voluntary and unconstrained choice. See Cedano-Medina, 366 F.3d at 687 (given the defendant's limited English proficiency, the use of a Spanish consent form would have been desirable, "but there is no bright-line rule requiring the use of such forms in situations like this").

## F. Scope of Search

61.     Meran contends that even if his consent to search was voluntary, it only applied to the interior of the van and it did not extend to the trap. (ECF No. 66, ¶ 19.) According to Meran, a reasonable person in his shoes would have understood Corporal Grenci's request to refer to a search of the interior of the van, not underneath of it. (Id., ¶ 20.)

62.     "When a warrantless search is authorized by voluntary consent, the extent of that

search is limited to the terms of the consent." United States v. Birt, 120 F. App'x 424, 428 (3d Cir. 2005) (citing Kim, 27 F.3d at 956)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).

63.     In Jimeno, the defendant granted a police officer permission to search his car without placing any limitation on the scope of the search. The officer informed the defendant that he believed the defendant was carrying narcotics, which is what he would be looking for in the car. The officer opened a folded paper bag on the passenger side floorboard and found cocaine inside. The Supreme Court found that the defendant's right to be free from unreasonable searches was not violated:

> [I]t was objectively reasonable for the police to conclude that the general consent to search [the defendant's] car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container.

Id.

64.     In this case, immediately before Corporal Grenci asked Meran if he could search the van, Corporal Grenci asked Meran if he had anything illegal in the van such as drugs or guns, and Meran replied, "no, no." (Ex. 1 at 13:32-13:35; Ex. 3 at 5.) Corporal Grenci's question concerning drugs and guns put Meran on notice that Corporal Grenci's search would focus on those items. When Meran consented to a search of the van, without limiting where Corporal Grenci could look, it was objectively reasonable for Corporal Grenci to conclude that Meran's consent applied to any part of the van, including containers therein, that could contain drugs or guns. See Jimeno, 500 U.S. at 251. A "typical reasonable person" would have understood the

exchange between Corporal Grenci and Meran to encompass consent to search the entire vehicle, including any area that might contain those items. See id.

65.     Corporal Grenci initially looked underneath the rear bumper area of the van and saw an aftermarket square box, which he knew was a compartment used to hide criminal contraband based on his training and experience. (ECF No. 86 at 66, 67, 170.) Although Corporal Grenci's look underneath the van was not outside the scope of Meran's consent, it is notable that "[t]he undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy." United States v. Rascon-Ortiz, 994 F.2d 749, 754 (10th Cir. 1993).

66.     After Corporal Grenci noticed the aftermarket square box underneath the van, he peeled back the plastic piece that sits on top of the bumper and saw a metal box that looked like the traps that his fellow troopers had found on other Honda Odyssey minivans. (ECF No. 86 at 67-68.) Corporal Grenci's look inside the bumper to confirm the existence of a trap did not exceed the scope of Meran's consent. See United States v. Ferrer-Montoya, 483 F.3d 565, 568-69 (8th Cir. 2007) (officer did not exceed the defendant's scope of consent to search vehicle for drugs by removing screws from console panel and lifting panel to reveal hidden compartment; the defendant placed no limitation on his consent to search and the officer noticed scarring on screws that held panel in place, which indicated to him, based on his experience, the presence of a compartment used to hide contraband); Zapata, 180 F.3d at 1243 (concluding that a vehicle search did not exceed the scope of consent merely because officer forced open a secure compartment that reasonably could contain the object of the search).

67.     The court finds it was reasonable for Corporal Grenci to conclude that Meran's consent to search extended to the entire van, including the trap, because the trap clearly could

contain items such as drugs or guns. See Kim, 27 F.3d at 956 (observing that the principle underlying the Jimeno ruling is that "when one gives general permission to search for drugs in a confined area, that permission extends to any items within that area that a reasonable person would believe to contain drugs."). Because Meran voluntarily consented to a search of the entire van, the motions to suppress evidence recovered from the search of the van, including the trap, will be denied.

### G. **Automobile Exception**

68.     Even assuming for the sake of argument that Corporal Grenci exceeded the scope of Meran's consent to search, the heroin found in the trap is admissible under the automobile exception.

69.     "The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" United States v. Burton, 288 F.3d 91, 100 (3d Cir. 2002) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)). "While a seizure or search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the 'ready mobility' of automobiles permits their search based only on probable cause." Burton, 288 F.3d at 100 (citing Maryland v. Dyson, 527 U.S. 465, 466–67 (1999)).

70.     "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825 (1982). Probable cause exists when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

71.     One court in this district observed that "evidence of a hidden compartment within

33

a suspect's automobile can contribute to, and, under appropriate circumstances, may even single-handedly establish, a finding of probable cause." Gooch, 915 F. Supp. 2d at 719 (collecting decisions from the Fifth and Tenth Circuit Courts of Appeals that have so held).

72.    In Gooch, the court found that the police officer's observation of a loose liner in the trunk of a car would lead a reasonable officer with similar training and experience to conclude that the vehicle contained a hidden compartment. Id. at 721. The court concluded that evidence of the hidden compartment, in conjunction with the other factors present, which included the suspicious nature of the defendant's travel plans, the lack of luggage in the vehicle relative to the length of the defendant's journey and the use of a borrowed vehicle, would lead an objectively reasonable officer to determine that there was at least a fair probability that contraband would be found under the lining in the trunk. Id. Therefore, the court held that the officer's search of the area behind the trunk liner did not violate the Fourth Amendment pursuant to the automobile exception. Id.

73.    As previously discussed, when Corporal Grenci initially looked under the rear bumper area of the van, he saw an aftermarket square box, which he knew was used to hide contraband based on his training and experience. (ECF No. 86 at 66, 67, 170.) Evidence of the hidden trap, in conjunction with Corporal Grenci's other observations (that the van had dark window tint; it was travelling on a highway known as a major drug corridor; it was a third-party vehicle registered out of Philadelphia, which is a source area for narcotics; Meran only knew the owner's first name; both defendants were from the New York area, which is another source area; there was a single key in the ignition; and there were air fresheners and an energy drink in the van) would lead a reasonable officer with similar training and experience to conclude that there was at least a fair probability that contraband would be found in the trap. See Gates, 462 U.S. at

34

238. For these reasons, the court finds that Corporal Grenci had probable cause to search the trap pursuant to the automobile exception.

## H. **Miranda Warnings and Waiver**

74.     Meran seeks to suppress all statements he made after he was ordered out of the van. (ECF No. 90, ¶ 172.) Meran suggests that the interrogation in this case is divided into two periods: (1) after he was ordered out of the van until he was handcuffed and placed in Trooper Warman's vehicle; and (2) while he was in Trooper Warman's vehicle being transported to the PSP Mercer barracks through and including the time at the barracks. (Id., ¶ 175.) Meran claims that any statements made during the first period must be suppressed because he was not free to leave and was not given any Miranda warnings. (Id., ¶¶ 176, 178.) With respect to the second period, Meran acknowledges that Trooper Warman recited his Miranda rights, but argues there was no indication that he understood his rights or that he waived them and thus any statements he made must be suppressed. (Id., ¶¶ 179, 180, 183, 184.) Hernandez makes similar arguments about any statements he made. (ECF No. 92 at 32-36.)

75.     The government argues that both defendants failed to present any evidence at the hearing to indicate they were in custody at any time, thus suppression is not warranted with respect to any of their statements. (ECF No. 91, ¶ 14.) Alternatively, the government contends that even if the court entertains defendants' motion to suppress statements: (1) defendants were not in custody until after the heroin was found in the trap and they were arrested and thus, all statements they made prior to that point are admissible; and (2) in any event, all statements defendants made after their arrest also are admissible because they never proved that they were in custody. (Id., ¶ 47.)

76.     "As a general rule, the burden of proof is on the defendant who seeks to suppress

evidence. However, once the defendant has established a basis for his motion ... the burden shifts to the government." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citations omitted). "A defendant 'satisfies that burden if he alleges that he was subjected to custodial questioning without the benefit of Miranda warnings,' at which point the government must 'prove by a preponderance of the evidence that there was no custodial interrogation implicating Miranda, there was some exception to the Miranda rule, or ... [the defendant] ... was properly Mirandized and waived his rights.'" United States v. Valenta, Crim. No. 15-161, 2017 WL 2131375, at *4 (W.D. Pa. May 17, 2017) (quoting United States v. Tudoran, 476 F. Supp. 2d 205, 216 (N.D.N.Y. 2007) (citation omitted)). Here, defendants seek to suppress any statements they made when they were subjected to custodial interrogation because they did not receive proper Miranda warnings and they did not knowingly and voluntarily waive their Miranda rights. The government has the burden of establishing by a preponderance of the evidence that Miranda was not implicated or that defendants were properly Mirandized and waived their rights.

77.    A defendant who "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in Miranda v. Arizona, 384 U.S. 436, 444 (1966). These warnings are required because custodial interrogation involves "inherently compelling pressures." Id. at 467. A person is in custody for Miranda purposes when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Maryland v. Shatzer, 559 U.S. 98, 112 (2010) (quoting New York v. Quarles, 467 U.S. 649, 655 (1984)). If a person has not been formally arrested when the statements in question are made, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." Steigler v.

Anderson, 496 F.2d 793, 799 (3d Cir. 1974).

78.     "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). The question is whether, under the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995).  Some of the objective factors to consider are: whether the officers told the suspect that he was under arrest or free to leave; the location of the interrogation; the length of the interrogation; whether officers used coercive tactics such as a hostile tone of voice, the display of weapons or physical restraint; and whether the suspect voluntarily submitted to questioning. United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006) (citations omitted).

79.     When the police fail to give adequate Miranda warnings, or fail to give any Miranda warnings whatsoever, any statement made by an individual who is subject to custodial interrogation is inadmissible at trial.  Rhode Island v. Innis, 446 U.S. 291, 297 (1980).

80.     Defendants first argue that any statements they made after they were ordered out of the van until they were handcuffed and placed in Trooper Warman's vehicle should be suppressed because they did not receive Miranda warnings despite having been subjected to custodial interrogation.

81.     The Supreme Court has held that the questioning of a motorist detained pursuant to a routine traffic stop does not constitute custodial interrogation for Miranda purposes. Berkemer v. McCarty, 468 U.S. 420, 440 (1984); see United States v. Anderson, 859 F.2d 1171, 1177 (3d Cir. 1988) ("[T]he roadside questioning of a motorist detained pursuant to a routine traffic stop is not custodial in nature and a Miranda warning is not required.").  Therefore,

Corporal Grenci was not required to give defendants Miranda warnings prior to posing questions concerning the traffic stop and requesting defendants' identifying information and proof of vehicle registration.

82.    As discussed above, the totality of Corporal Grenci's observations at the scene of the traffic stop created reasonable suspicion that defendants were involved in criminal activity, which justified the extension of the stop for further investigation and ultimately resulted in a search of the van. During that time frame, there is no indication that defendants were in custody for Miranda purposes. The troopers did not advise defendants that they were under arrest, the troopers did not interact with defendants in a hostile or coercive manner, or display their weapons at any point, and defendants were not handcuffed or restrained in any manner. See Willaman, 437 F.3d at 359-60. In addition, Meran voluntarily consented to a search of the van during this period, which further demonstrates that the surrounding circumstances were not hostile. Accordingly, Miranda warnings were not required while Corporal Grenci conducted additional investigation and searched the van at the place of the stop.

83.    For the reasons stated in paragraphs 81 and 82, defendants' motion to suppress any statements they made related to the traffic stop and while Corporal Grenci conducted additional investigation and searched the van at the place of the stop will be denied.

84.    After Corporal Grenci located the trap and decided to detain defendants, (ECF No. 86 at 69, 125), Miranda was implicated because defendants were in custody at that point.

85.    Although Corporal Grenci told defendants they were just being detained until the trap could be opened, Trooper Warman informed Meran that he was not free to go after he was handcuffed and before he was placed in Trooper Warman's patrol vehicle. (Id. at 75, 176; Ex. 4 at 3.) Obviously, one is not free to leave when sitting in a police car with handcuffs on. See

38

United States v. Brownlee, 454 F.3d 131, 146 (3d Cir. 2006) ("Clearly, the defendant was in custody when he was in the back of the police car."). When defendants were placed in Trooper Warman's vehicle, they were in custody for Miranda purposes because their freedom of movement was restricted to "the degree associated with a formal arrest." Shatzer, 559 U.S. at 112.

86.     After Trooper Warman advised Meran he was not free to go, Trooper Warman recited the Miranda warnings to Meran in English. (ECF No. 86 at 178; Ex. 2 at 10:50-11:12; Ex. 4 at 3.) Meran never stated he understood his Miranda rights or agreed to waive them. Trooper Warman immediately began asking Meran questions without pausing to confirm whether Meran understood his rights and agreed to waive them and speak with him. (ECF No. 86 at 181; Ex. 2 at 11:14; Ex. 4 at 3.) Trooper Warman conceded that he did not know whether Meran understood his Miranda rights and his report does not indicate that Meran waived them. (ECF No. 86 at 185, 205.)

87.     To determine whether a Miranda waiver is valid, the government must establish that: "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id. (citation omitted). The government has "the burden of proving, at least by a preponderance of the evidence, the Miranda waiver." Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004) (citing Colorado v. Connelly, 479 U.S. 157, 169 (1986)).

88.     The government did not meet its burden to prove that Meran knowingly and voluntarily waived his Miranda rights. Trooper Warman recited the Miranda warnings to Meran on the side of the highway as traffic passed by, which created significant background noise. (Ex. 2 at 10:50.) Trooper Warman recited the Miranda warnings very quickly in English, listing them one after the other without pausing at any point to verify or confirm whether Meran understood his rights. (Id. at 10:50-11:12; Ex. 4 at 3.) Trooper Warman conceded this when he testified at the suppression hearing:

> ATTORNEY KRATKA: ... [Meran] never indicated he understood each of those rights, correct?
>
> TROOPER WARMAN: He didn't say anything, no.
>
> ATTORNEY KRATKA: You just continued to read each right that he had one after the other without him acknowledging that he understood that right?
>
> TROOPER WARMAN: Yes, he didn't acknowledge that.

(ECF No. 86 at 181.) When the court asked Trooper Warman whether he believed Meran understood his Miranda rights, Trooper Warman responded, "I don't know at that time when I read the rights that he understood them but as it progressed, I believed that he could understand English." (Id. at 205.)

89.     Despite rushing through the Miranda warnings in a noisy setting on the side of the highway *and* admitting that he did not know whether Meran understood his rights when he recited them, Trooper Warman immediately launched into questioning Meran without an acknowledgement from Meran that he was willing to waive his rights and speak with Trooper Warman. (Ex. 2 at 11:14; Ex. 4 at 3.)

90.     The rushed manner in which Trooper Warman administered the Miranda

warnings and Trooper Warman's failure to pause for Meran to acknowledge that he understood his rights at any point prior to launching into questioning are factors that weigh against a finding that Meran voluntarily waived his Miranda rights. See Berghuis v. Thompkins, 560 U.S. 370, 384 (2010) ("If the [government] establishes that a Miranda warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of Miranda rights. The [government] must make the additional showing that the accused understood these rights.") (citations omitted).

91.    The rushed manner in which Trooper Warman administered the Miranda warnings and his failure to pause before commencing his questioning would have made it virtually impossible for any defendant, regardless of his primary language,[7] to signify whether he understood his rights and whether he agreed to waive them and speak with Trooper Warman.[8]

92.    Trooper Warman agreed that the waiver of Miranda rights is an important fact, but conceded that his report of the incident does not indicate Meran waived his Miranda rights and agreed to speak to him. (ECF No. 86 at 185.)

93.    Nothing in the record indicates that Meran waived his Miranda rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision

---

[7]    The Third Circuit Court of Appeals has recognized that "[a] language barrier may be a valid factor to consider in examining the validity of a waiver." United States v. Caraballo, 643 F. App'x 163, 169 (3d Cir. 2016) (citing United States v. Sriyuth, 98 F.3d 739, 749 (3d Cir. 1996)). The court's focus here is not any language limitation that may exist because Meran could sufficiently understand English to give voluntary consent to search as discussed in Part II.E., supra. Although any difficulty Meran has with English would not necessarily preclude a finding that he voluntarily waived his Miranda rights, the court finds that the government did not establish by a preponderance of the evidence that Meran waived his rights for the reasons discussed herein.

[8]    Trooper Warman's interaction with Meran concerning his Miranda rights differs significantly from the exchange between Corporal Grenci and Meran, which preceded Meran's voluntary consent to search the van. As previously discussed, Corporal Grenci's request to search the van was clear and direct, and Meran did not hesitate to respond to him. Corporal Grenci asked Meran if he could perform a search, and Meran immediately replied, "yeah, yeah, yeah, sure." (ECF No. 86 at 62; Ex. 1 at 13:36-13:37; Ex. 3 at 5.) To be certain that Meran consented to the search, Corporal Grenci asked him a second time, and Meran again responded affirmatively without hesitation. (ECF No. 86 at 62; Ex. 1 at 13:38-13:40; Ex. 3 at 5.) Unlike Corporal Grenci, Trooper Warman failed to secure any acknowledgment from Meran that he understood his Miranda rights and agreed to waive them.

to abandon it." Moran, 475 U.S. at 421.

94.    The court finds, under the totality of the circumstances, that Meran did not
knowingly and voluntarily waive his Miranda rights; thus, any statements he made to Trooper
Warman when Trooper Warman questioned him while they were in the patrol vehicle, including
during transport from the scene of the traffic stop to the PSP Mercer barracks, are inadmissible at
trial.[9]

95.    Hernandez was in custody for Miranda purposes after he was handcuffed and
placed in the police vehicle, but Trooper Warman did not read or recite Hernandez his Miranda
rights then or at any other time. (ECF No. 86 at 202, 203.) Trooper Warman's failure to
administer Miranda warnings to Hernandez is a moot point because the record does not indicate
that Trooper Warman verbally interrogated Hernandez during transport from the scene of the
traffic stop to the PSP Mercer barracks.[10]

96.    The record does not indicate that defendants were verbally interrogated while they
were shackled to a bench in the control room at the PSP Mercer barracks.

97.    After Corporal Grenci opened the trap and recovered four kilograms of heroin
from it, defendants were informed that they were under arrest. (ECF No. 86 at 73-74, 82, 172-
73.) Trooper Warman approached defendants with backpacks which were recovered from the
van, he held each backpack up one at a time, and each defendant indicated with a head nod

---

[9]    For the reasons explained above, Miranda does not apply to the recorded conversation and comments in
Spanish between Meran and Hernandez while they were in Trooper Warman's vehicle, including during transport to
the PSP Mercer barracks. See supra at 26-28, ¶¶ 47-50. To reiterate, Meran and Hernandez made comments and
conversed in Spanish between themselves, not in response to questioning by Trooper Warman. Their voluntary
statements in Spanish, which were translated into English, will not be suppressed.

[10]    If Hernandez had made any statements in response to questioning by Trooper Warman during transport to
the PSP Mercer barracks, those statements would be inadmissible at trial. It would be irrelevant that Hernandez was
present when Trooper Warman recited Miranda warnings to Meran in English because Trooper Warman conceded
that Hernandez had a hard time understanding him. (ECF No. 86 at 169, 198, 200.) Nothing in the record indicates
that the government would be able to show that Hernandez could understand Miranda warnings or could knowingly
and voluntarily waive his Miranda rights.

which backpack belonged to him. (Id. at 173-74.) Trooper Warman acknowledged that he did this because he wanted defendants to tell him who owned the backpacks. (Id. at 174.)

98.     Trooper Warman's act of holding up the backpacks for identification by defendants after they were arrested is the functional equivalent of custodial interrogation for Miranda purposes. See Innis, 446 U.S. at 301 ("[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

99.     The Supreme Court made clear in Innis that the interrogation analysis focuses "primarily upon the perceptions of the suspect, rather than the intent of the police." Id. Despite the focus on the suspect's perceptions, the police officer's intent still is relevant. See id. n.7 ("This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response.").

100.    It is apparent that defendants perceived Trooper Warman's act of holding up the backpacks as a request for identification because each defendant nodded his head to signify ownership of a backpack. Trooper Warman conceded that his intent in holding up the backpacks was to have defendants acknowledge who owned each one.

101.    Trooper Warman's action was the functional equivalent of custodial interrogation, which elicited a response from defendants; yet, Trooper Warman did not administer Miranda warnings before he signaled for defendants to identify the backpacks. Accordingly, the court

43

finds that defendants' identification of the backpacks was obtained in violation of <u>Miranda</u> and will be inadmissible at trial.

An appropriate order will be entered.


Date:   October 23, 2017                        By the court,

                                                /s/ Joy Flowers Conti
                                                Joy Flowers Conti
                                                Chief United States District Judge